J-S76030-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE MATTER OF THE ADOPTION OF: J.M.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.S., NATURAL MOTHER | No. 1231 WDA 2014 |

Appeal from the Order entered July 14, 2014
in the Court of Common Pleas of Erie County
Orphans' Court, at No(s): 10 In Adoption 2014

| IN THE MATTER OF THE ADOPTION OF: J.E.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.S., NATURAL MOTHER | No. 1234 WDA 2014 |

Appeal from the Order entered July 14, 2014,
in the Court of Common Pleas of Erie County
Orphans' Court, at No(s): 10A In Adoption 2014

BEFORE:    FORD ELLIOTT, P.J.E., PANELLA, J., and OLSON, J.

MEMORANDUM BY PANELLA, J.                **FILED JANUARY 23, 2015**

S.S. ("Mother") appeals the orders entered on July 14, 2014, which granted the petitions filed by Erie County Children and Youth Services ("CYS") to involuntarily terminate Mother's parental rights to her minor female child, J.M.S. (born in October 2006), and to her minor male child, J.E.S. (born in November 2007), collectively ("Children"), pursuant to section 2511(a)(2) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2) and (b).  We affirm.[1]

---

[1] The trial court also entered decrees terminating the parental rights of the unknown biological fathers of both Children.  The putative father for J.M.S. is

In its Rule 1925(a) opinion, the trial court set forth the facts and procedural history of the case. On August 15, 2013, the trial court adjudicated the Children dependent, after CYS took them into custody on July 30, 2013, due to accusations of sexual abuse, physical abuse, inappropriate physical discipline and supervision, and Mother's failure to adequately address the Children's behavioral and mental health issues. CYS had been involved with Mother and the Children since December 1, 2008, and there have been sixteen referrals to CYS from 2008 to 2013. *See* Trial Court Opinion, 8/26/2014, at 3.

J.M.S. was found to be a victim of sexual abuse at an early age by T.G., a friend and a temporary member of Mother's household, as well as J.M.S.'s caregiver. *See id*. J.M.S. was also sexually abused a second time by the son of an in-home daycare provider. *See id*. at 3-4. Following the abuse, J.M.S. acted out sexually and in an inappropriate manner. *See id*. at 4. Mother took J.M.S. to the Crime Victim Center for therapy for her sexual abuse, but Mother stopped taking J.M.S. because she felt that play therapy was inappropriate for a rape victim. *See id*.

J.E.S. has severe mental health issues. *Id*. J.E.S. has been diagnosed with Attention Deficit Disorder, Oppositional Defiant Disorder, Post-Traumatic Stress Disorder and Reactive Attachment Disorder. *See id*. J.E.S.'s behavior problems began when he was two and a half years old,

_____

P.G., who did not appear at the termination hearing; his whereabouts are unknown. The fathers are not parties to this appeal.

when he witnessed his sister's rape by the in-home daycare center. *See id*. J.E.S. was abused by a caregiver who was also a member of Mother's household. *See id*. Like J.M.S., J.E.S. acted out inappropriately in a sexual and physical manner. Mother failed to engage in care to adequately address J.E.S.'s mental health issues. *See id*.

In May of 2013, J.E.S. was admitted to Millcreek Community Hospital. *See id*. at 5. J.E.S.'s discharge instructions recommended admission to a residential treatment facility. The recommendation also included a family-based mental health service. *See id*. Mother refused to comply with the recommendations. In addition, two adolescent psychiatrists recommended a residential treatment facility, but Mother also chose to ignore their advice. *See id*.

By the time of Mother's last referral to CYS, the evidence clearly demonstrated that detention and adjudication were warranted. The evidence revealed that Mother would tape the Children's mouths shut and place them in time-out in that condition for periods of time up to an hour. *See id*. Mother also admitted that she would lock the Children in their rooms throughout the day in order for her to have quiet time. In addition, Mother also admitted that she locked them in their rooms at night so that they could not eat any of the food in the kitchen. *See id*. Later, at the adjudication hearing, Mother recanted her previous statement, and stated that she locked the Children in their rooms because of the knives in the

kitchen. *See id*. Mother further admitted that she hit J.E.S. in the penis due to the fact that J.E.S. hit J.M.V. in the vaginal area. *See id*.

In addition, CYS was also concerned about the multiple caregivers to which the Children were exposed to throughout their lives. CYS received numerous referrals because a male household member physically abused the Children. *See id*. at 5-6. In April 2013, CYS advised Mother to not allow him to care for the Children. Mother ignored CYS and continues to use the man as a caregiver despite CYS's advice. *See id*. at 6.

Following adjudication of the Children, a dispositional hearing was held on September 6, 2013, and a permanency plan was established. A permanency plan was set up for Mother and the Children, and required Mother to refrain from the use of drugs or alcohol; to complete drug and alcohol treatment provided through the Agency; to complete an approved parental skills education program and demonstrate the ability to provide for the health, safety and welfare of the Children; to complete a mental health evaluation; and to comply with treatment recommendations and demonstrate mental health stability. *See id*. The permanency plan also required Mother to attend visitation periods with the Children as scheduled and to comply with the conditions established; to participate in counseling directed toward learning how to exercise better judgment with the Children; and to learn how to properly respond in light of the Children's mental health problems. *See id*.

On January 29, 2014, a permanency hearing took place. The evidence showed that Mother failed to comply with drug testing that had been ordered; failed to complete a parenting skills class; failed to demonstrate that she now had the ability to provide for the safety, health and welfare of the Children, one of whom still suffered from the trauma of seeing his sister raped; failed to comply with the recommendations made by two adolescent psychiatrists for the treatment of her son; failed to consistently visit with the Children as scheduled; and failed to participate in counseling for herself so that she could begin to develop the skills necessary to exercise better judgment in dealing with the Children and their mental health problems. ***See id***. at 6-7.

The record is replete with instances of non-compliance by Mother. Mother's progress addressing drug and alcohol issues was hampered by Mother's refusal to keep appointments to give samples for testing. ***See id***. at 6. Mother continuously refused to keep appointments to give samples for testing and continuously had no-show positives, making excuses for her failure to comply. ***See id***. at 7-8.

Mother did not complete a parenting skills education program, nor did Mother demonstrate the ability to adequately provide for the health, safety, and welfare of the Children. Mother testified that she had back problems, which made it difficult for her to sit through the hour and a half classes, and that she was not permitted to stand during the classes since it was

- 5 -

disruptive. Therefore, Mother still attends the parenting class, which should have been completed, before the termination hearing. *See id*. at 8.

Moreover, Mother failed to complete a mental health evaluation and to fully comply with recommendations for treatment in order to demonstrate mental health stability. Mother's testimony showed that she was evaluated by a psychiatrist on October 15, 2013. However, after attending individual therapy, Mother failed to attend her last appointments and failed to give a reason for her absence. *See id*.

It is worth noting that Mother failed to participate in counseling designed to teach her how to exercise better judgment with regard to the Children and how to properly respond to the Children in light of their mental health problems due to their sexual abuse. They discharged her for non-compliance with the program.

Mother participated in a separate family therapy program at the residential treatment facility where J.E.S. remains placed. However, Mother's efforts have been superficial, and she has yet to accept responsibility for the removal of the Children from the home and the behavioral issues, which the Children exhibit due to the trauma they suffered while living in the home. *See id*. at 9.

Since the removal of J.M.S. from Mother's home, J.M.S. is engaged in therapy and has made improvements in her behavior. She is currently in a foster home. At the time of the involuntary termination hearing, an adoptive resource for J.M.S. had been located, and visitation had begun. The visits

appear to be going well. ***See id***. at 9. J.M.S. had not visited with Mother since May of 2014, does not ask about Mother, and is thriving in her current placement. ***See id***.

J.E.S.'s situation is more problematic. J.E.S. remains in a residential treatment facility and still has behavioral problems. J.E.S. is improving. However, there is no adoptive resource for him. J.E.S. does not talk about Mother and appears to have no bond with her. While J.E.S.'s situation is not ideal, it is an improvement over living with Mother, where little, if anything, was done to address his needs. ***See id***. at 9-10.

By orders entered on July 14, 2014, the trial court involuntarily terminated Mother's parental rights to the Children. On July 28, 2014, Mother timely filed notices of appeal. By order of this Court dated August 25, 2014, the cases filed at 1231 and 1234 WDA 2014 were consolidated *sua sponte*.

On appeal, Mother presents three issues:

1. Whether the [trial] court committed an abuse of discretion or error of law when it concluded that [CYS] established grounds for termination under 23 Pa.C.S.A. Section 2511(a)(2)[?]

2. Whether the [trial] court committed an abuse of discretion or error of law when it concluded that [CYS] established grounds for termination under 23 Pa. C.S.A. Section 2511(a)(5)[?]

3. Whether the [trial] court committed an abuse of discretion or error of law when it concluded that [CYS] established grounds for termination under 23 Pa.C.S.A. Section 2511(b)[?]

Mother's Brief at 6.

Initially, we review the termination decree according to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id*.; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the decrees terminated Mother's parental rights pursuant to § 2511(a)(1), (2), (5), (8), and (b). This Court must agree with only one subsection of 23 Pa.C.S.A. § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decrees pursuant to § 2511(a)(2) and (b), which provide as follows.

> **(a)** **General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \*\* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental case, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

The trial court found that, under § 2511(a)(2), the repeated and continued incapacity of Mother caused the Children to be without essential parental care, control or subsistence necessary for the well-being of the Children, and that the conditions and causes of the incapacity cannot and will not be remedied by Mother. In this case, evidence shows that not only has Mother consistently displayed poor judgment through her non-compliance with the permanency plan, but that Mother has endangered the Children with inappropriate caregivers, lack of supervision, physical abuse and inconsistent care for the Children's behavioral and mental health. In the termination proceeding, the focus is on the conduct of the parent and

whether the conduct justifies the termination of parental rights. ***See In re B., N.M.***, 856 A.2d 847, 854-855 (Pa. Super. 2004).

In this case, Mother's history is well-documented in the record. Although Mother has made some *minimal* progress with some of the objectives in Mother's plan, *none* of the objectives in Mother's plan has been completed. The trial court found that, until Mother completes the plan, success cannot be declared, and that the importance of the service plan and the goal it identifies for the Children cannot be overemphasized. ***See In re J.S.W.***, 651 A.2d 167 (Pa. Super. 1994). In addition, the evidence clearly demonstrated that Mother's continued incapacity, abuse, neglect, or refusal to parent could not or would not be remedied, despite CYS's offering reasonable efforts to assist in reunification with the Children. After a careful review of the record, we find no merit to Mother's argument concerning § 2511(a)(2).

Next, in reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the

- 11 -

effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-29, 71 A.3d 251, 267 (2013).

In reviewing the evidence, the trial court found that Mother does not have a strong bond with the Children—neither Child has even asked about her. The evidence reveals that J.M.S. is in a foster home and is receiving the care that she needs. J.M.S. has also begun weekend visits with a permanent adoptive resource. J.E.S. is in a residential treatment facility, and has been showing progress in his treatment. Thus, the evidence reveals that, once removed from Mother's care, the Children have had no adverse effects, and are thriving, despite Mother's lack of progress. *See* N.T., 4/11/14, at 77-83.

Although Mother may love the Children and desire an opportunity to serve as their mother, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010); N.T., 7/12/13, at 59. We stated in *In re Z.P.*, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

- 12 -

Accordingly, we affirm the orders terminating Mother's parental rights to the Children.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/23/2015